UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

REA INVESTMENTS, LLC,                                      Case No. 23-CV-1159 (PJS/JFD)

        Plaintiff,

v.                                                                                         ORDER

NOVEL ENERGY SOLUTIONS, LLC,

        Defendant.

    Robert L. Smith, Colin M. Bruns, Christian D. Poppe, Katherine E. Seivert Erdman, Matthew T. Collins, FABYANSKE, WESTRA, HART & THOMSON, PA, for plaintiff.

    Melissa R. Alvarez, Jennifer L. Filippazzo, MCDERMOTT WILL & EMERY; and Roxanna Gonzalez, DORSEY & WHITNEY LLP, for defendant.

REA Investments, LLC ("REA") brought this action against Novel Energy Solutions, LLC ("Novel"), alleging that Novel breached the parties' Project Provision Agreement ("PPA") to develop community solar gardens ("CSGs"). Novel counterclaimed against REA for breach of the PPA as well as for breach of the parties' Lease Provision Agreement ("LPA"). This matter is before the Court on the parties' cross-motions for partial summary judgment. After reading the briefs, hearing extensive oral arguments, and carefully reviewing the record, the Court concludes that the PPA is ambiguous and that many material facts are in dispute. The Court therefore

denies the summary-judgment motions, except the Court grants REA's motion with respect to two of Novel's counterclaims.

## I.  BACKGROUND

REA is a Missouri company that finances solar-energy projects.  Mills Decl. ¶ 2, ECF No. 119.  Novel is a Minnesota company that develops and operates CSGs.  Kaehler Decl. ¶ 2, ECF No. 134.  A CSG is a solar-energy project to which a utility customer may subscribe.  Minn. Stat. § 216B.1641 subd. 1(b).  Subscribers generally receive credit on their electric bills to reflect the electricity generated by their CSG.  *Id.*; *see also* Bruns Decl. Ex. 1 at 6, ECF No. 120.

Between 2019 and 2020, Novel and REA completed about 30 transactions in which Novel sold CSGs that it had developed to REA and then operated those CSGs on REA's behalf.[1]  Mills Decl. ¶¶ 3–4; Kaehler Decl. ¶ 6.  In September 2020, Novel offered to sell 100 solar sites to REA in a bundle.  *See* Bruns Decl. Ex. 3.  Novel had no choice but to sell some of those sites because keeping them would create "co-location" problems for Novel.[2]  *Id.*  REA expressed interest, and the parties began negotiations.

---

[1]Each transaction had a uniform structure consisting of a Membership Interest Purchase Agreement ("MIPA"), an Engineering, Procurement, and Construction Agreement ("EPCA"), an Operation and Management Agreement ("OMA"), and a Subscriber Management Agreement ("SMA").  Mills Decl. ¶ 4.

[2]Co-location occurs when a given site hosts multiple CSGs that "exhibit characteristics of a single development."  Bruns Decl. Ex. 1 at 13–15.  The Minnesota
(continued...)

REA's counsel circulated the first draft of the LPA on November 19, 2020. *See* Bruns Decl. Ex. 10. Under the draft LPA, Novel agreed to sell and REA agreed to buy leases for plots of land on which CSGs could be constructed and operated. LPA § 2, Bruns Decl. Ex. 30. With respect to each lease, REA agreed to pay "the sum of thirty cents ($0.30) per watt of DC capacity with respect to the resulting [CSG]" on the plot, with partial payments due at certain milestones in the CSG's development. *Id.* §§ 2–3.

On December 30, 2020, Novel circulated the first draft of the PPA, which, like the LPA, addressed the development of solar-energy projects. Bruns Decl. Ex. 18. Drafts of the LPA and PPA continued to be amended and circulated by email (sometimes together) for the next few months. *See* Bruns Decl. Exs. 19–24. On March 22, 2021, the parties executed the PPA. PPA, Bruns Decl. Ex. 26.

Section 1 of the PPA provides that:

> The Parties hereto intend to develop certain solar projects initially procured by Novel (each a "Project" and collectively the "Projects"). During the term of this Agreement, Novel shall bring Projects to REA as at least one of the following occurs for a given Project: (i) Novel receives an

---

²(...continued)
Public Utilities Commission imposes strict limitations on co-located CSGs, as it does not want developers to be able to skirt the size restrictions placed on CSGs—and thereby created utility-scale projects—by clustering (or "co-locating") many CSGs in one location. *Id.*

>   interconnection agreement[3] for the applicable Project (each
>   an "IA" and collectively "IAs"), or (ii) Novel obtains a lease
>   for the applicable Project (each a "Lease" and collectively,
>   "Leases").  Novel shall continue to provide Projects to REA
>   until REA has received at least fifty (50) megawatts of
>   Projects from Novel.

*Id.* § 1.

As the Court will explain, the main issue in this lawsuit is whether Novel provided 50 megawatts of Projects to REA, as Novel was obligated to do under the PPA. That issue turns on what counts as a "Project" for purposes the PPA.

In May 2021, Novel transferred three IA Projects to REA "using similar terms, conditions, purchase agreements, etc. as the Q3 and Q4 2020 portfolio purchases," PPA § 5(a)—meaning that the parties executed MIPAs, EPCAs, OMAs, and SMAs.  Mills Decl. ¶¶ 5–6.  On June 3, 2021, Novel assigned nine "bare" leases to REA—that is, leases that had not received IAs.  Bruns Decl. Ex. 29.  These nine leases were supposedly transferred pursuant to the LPA, despite the fact that the LPA had not been executed. At that point, the parties had agreed on most of the terms of the LPA, but they had not yet settled on the exact leases that would be sold under the LPA. Filippazzo Decl. Ex. S, ECF No. 135; Bruns Decl. Ex. 28.  In fact, the parties continued to propose changes to the LPA until December 16, 2021, when the final draft was circulated but never executed. Filippazzo Decl. Ex. J; Bruns Decl. Ex. 30.

---

[3] A CSG must have an interconnection agreement ("IA") with Xcel Energy (the regional electric utility) to access the electrical grid.  Kaehler Decl. ¶ 19.

On December 30, 2021, Novel transferred an additional six IA Projects to REA, for a total of nine IA Projects (~18 megawatts).  Mills Decl. ¶¶ 7–8.  The parties agree that these nine IA Projects qualify as "Projects" under the PPA and count toward Novel's 50-megawatt commitment.

By February 25, 2022, Novel and REA apparently agreed on another 22 bare leases to be sold under the LPA, for a total of 31 bare leases (~42 megawatts).  Bruns Decl. Ex. 32; Kaehler Decl. ¶¶ 15, 17.  The record is devoid of any evidence as to whether or when some or all of those 22 leases were actually assigned to REA, but it appears that REA (or one of its partners) entered the leases into the Xcel queue in order to obtain IAs.  *See* ECF No. 166.  Novel stopped offering additional Projects to REA around May 26, 2022.  Mills Decl. ¶ 17.

On or about November 14, 2022, REA began the process of withdrawing leases from the IA queue.  Filippazzo Decl. Ex. R; Hamilton Dep. 168:5–169:23.  The record is not clear, but it appears that 22 leases were removed from the IA queue by REA on or about December 19, 2022.  Filippazzo Decl. Exs. K, L.  REA did not inform Novel that it would not be developing any of those 22 leases—nor did REA offer those leases back to Novel—until March 27, 2023.  Bruns Decl. Ex. 33; Filippazzo Decl. Ex. T.  Two months later, REA commenced this action.  ECF No. 1.

## II. ANALYSIS

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wobig v. Safeco Ins. Co. of Ill.*, 40 F.4th 843, 847 (8th Cir. 2022) (citing *Johnson v. Safeco Ins. Co. of Ill.*, 983 F.3d 323, 329 (8th Cir. 2020)).

### B. Novel's Breach of the PPA

Both parties move for summary judgment on the issue of whether Novel breached the PPA by failing to meet the 50-megawatt commitment. REA contends that the 31 bare leases transferred pursuant to the LPA do *not* count toward the PPA's minimum and thus that Novel failed to provide at least 50 megawatts of Projects. Novel, by contrast, contends that the 31 LPA leases *do* count toward the PPA threshold—and that those 31 leases combined with the nine IA Projects provided REA with approximately 60 megawatts of Projects.

The parties agree that the PPA is a valid and enforceable contract. Curiously, the parties also agree that the LPA is a valid and enforceable contract, even though it was never executed, and even though its material terms (including the exact leases to be assigned) kept changing. But if the PPA and LPA are indeed valid and enforceable contracts, then they are poorly drafted contracts, and how the two contracts are meant to fit together (if at all) is a mystery.

Under Illinois law,[4] a court tasked with interpreting a contract must give effect to the parties' intentions as evidenced by the contract's language. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999). "[T]he 'four corners' rule precludes the consideration of extrinsic evidence where a contract contains an integration clause and is facially unambiguous." *Id.* at 886. A contract is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.* at 884. "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law . . . ." *Id.* If the contract is ambiguous, then extrinsic evidence may be considered to resolve the ambiguity. *Gomez v. Bovis Lend Lease, Inc.*, 22 N.E.3d 1, 4 (Ill. App. 2013). Unless the relevant extrinsic facts are undisputed, however, the meaning of the contract must be determined by the trier of fact. *Id.* at 6.

---

[4]Illinois law governs the PPA. PPA § 6(a).

Novel argues that the 31 LPA leases unambiguously count towards the 50-megawatt minimum because the PPA defines Projects to include "leases." *See* PPA § 1 ("Novel shall bring Projects to REA as at least one of the following occurs for a given Project . . . (ii) Novel obtains a lease for the applicable Project."). That is not true. In describing *when* Novel must bring a "Project" to REA, the PPA provides that Novel's obligation is triggered when Novel receives either an IA or a lease (or both) "for a given Project." But the PPA does not *define* either an IA or a lease *as* a "Project."

Despite the fact that the term is critical to the parties' agreement, "Project" is not defined by the PPA, except by the circular and unhelpful statement that "Projects" are "certain solar projects initially procured by Novel." PPA § 1. Consequently, the Court holds that the contracts are ambiguous. The language of the contracts leaves it far from clear whether the LPA leases represent "Projects" that count towards the 50-megawatt minimum under the PPA.

The extrinsic evidence is also not helpful:

In Novel's view, because the PPA did not itself transfer any Projects, the LPA was intended to effectuate the transfer of Lease Projects, just as the MIPAs, EPCs, OMs, and SMAs effectuated the transfer of IA Projects. One problem with this argument is that the LPA, like the PPA, did not in fact transfer any leases. A separate assignment still needed to be executed for each lease. LPA § 1.

-8-

In REA's view, the LPA and the PPA were entirely separate agreements. The LPA was meant to address co-located sites that Novel could not develop itself, while the PPA was meant to address Projects that REA and Novel would develop together. One problem with this argument is that the PPA provides alternative pricing for "3rd party Projects that [Novel] sources"—i.e., projects that REA and Novel would *not* develop together. PPA § 5(b).

In the Court's view, it is plausible that the LPA leases were meant to qualify as "Project Leases" under the PPA. Neither the PPA nor the LPA mentions the other, but both share a common purpose. The PPA describes its purpose as being "to develop certain solar projects initially procured by Novel." PPA § 1. Developing such solar projects requires land. Under the LPA, Novel was to provide REA with "leases for land on which to construct and operate solar photovoltaic projects." LPA at 1. Thus, at least at a superficial level, the two agreements seem to be two parts of the same enterprise.

That said, a further comparison of the terms of the PPA and the LPA complicates the matter. For example, the PPA requires a 50-50 split of Projects between REA and Novel with quarterly rebalancing based on the projected net operating income ("NOI") of each company's Projects. PPA § 2. According to the parties, however, the NOI of a Project cannot be calculated until an IA has been obtained; in other words, NOI cannot be calculated based only on a bare lease (such as one of the LPA leases). Hrg. Tr.

61:21–25, 69:6–16, ECF No. 165. Likewise, the PPA prices Projects based on a percentage of the "cap rate"—a figure that also cannot be calculated until a Project has obtained an IA. PPA § 5. Indeed, perhaps because of that impracticality, the LPA has an entirely different pricing structure that requires REA to pay a price-per-watt of total capacity rather than a percentage of the cap rate. LPA § 2.

On the one hand, then, bare leases (i.e., leases without IAs) could *never* be subject to the PPA's Project-splitting or pricing provisions, which indicates that LPA leases cannot possibly count as "Projects" under the PPA. One the other hand, such a reading essentially renders all of the PPA's language concerning leases superfluous since *no* leases (at least no leases without IAs) could ever be subject to its provisions. Thus, REA's position writes Lease Projects out of the PPA altogether, while Novel's position leads to seemingly irreconcilable conflicts within and between the agreements.

The parties also point to various statements made in their negotiations and to additional factual context (such as co-location issues) that they say support one theory or the other. None of this evidence is dispositive, however, and much of it is disputed. Moreover, a great deal of important evidence is simply not in the record. In short, the contracts are ambiguous, the extrinsic evidence is unhelpful, and the record is

inadequate. The Court therefore denies both parties' motions for summary judgment on REA's breach-of-contract claim against Novel.[5]

### C. Novel's Claims

#### 1. PPA

Novel claims REA breached the PPA by failing to providing tax-equity commitments, failing to provide Novel the opportunity to join REA in M&A sales and debt placements, and failing to make introductions to financing partners. *See* PPA § 4. REA moves for summary judgment on Novel's claims.

Regarding tax-equity commitments, Novel points to evidence that REA refused to provide tax-equity commitments for any Project save one. Kaehler Decl. ¶¶ 28–30. REA responds by pointing to evidence that REA offered to provide Novel with additional tax-equity commitments but Novel failed to provide necessary due diligence on its Projects. Mills Decl. ¶ 15. Thus, disputes of material fact preclude summary judgment on the tax-equity commitments.

---

[5]Novel also moves for summary judgment on REA's claim of breach of the implied covenant of good faith and fair dealing. Novel may be correct that under Illinois law those allegations should have been included in REA's contract claim rather than in a separate count. Regardless of any pleading mistake, however, the contract claim is headed to a jury, and Novel has had more than adequate notice of REA's allegation that Novel improperly exercised its discretion in violation of the implied covenant.

Likewise regarding the M&A sales and debt placements, Novel points to evidence that REA gave Novel only one opportunity to sell projects in M&A and never gave Novel an opportunity to join with REA in debt placements. Kaehler Decl. ¶ 32. REA responds by pointing to evidence that, after the execution of the PPA, REA did not participate in any debt placements (and thus had none to offer to Novel), and when REA attempted to include a Novel Project in an M&A sale, Novel declined to move forward. Mills Decl. ¶ 14. Thus, disputes of material fact preclude summary judgment on the M&A sales and debt placements.

Finally, regarding the financing introductions, Novel contends that REA failed to make any introductions after the execution of the PPA. Even if Novel is correct, however, the record contains no evidence of any harm that Novel suffered as a result. Whether any introductions would have resulted in financing opportunities—and if so, what type of opportunities and on what terms—is extremely speculative, and Novel proffers no expert testimony or other evidence that would allow a jury to find (much less to quantify) damages. *See Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871, 878 (Ill. 2022) ("[A] plaintiff alleging breach of contract bears the burden to establish damages with reasonable certainty."). For these reasons, the Court grants REA summary judgment on the issue of financing introductions.

2. LPA

As a preliminary matter, REA argues that Novel never asserted a breach of the LPA in its counterclaim—but asserted only a breach of the PPA—so any LPA claim is untimely. Although Novel did not mention the LPA in its counterclaim, Novel did identify the LPA's payment provision as the source of its damages for REA's decision to withdraw the leases from the IA queue. *See* Counterclaim ¶¶ 11–18, ECF No. 22. Further, the parties took extensive discovery on the LPA and on the LPA leases. *See, e.g.*, Kaehler Dep. 87:7–89:5. REA therefore had adequate notice that Novel was pursuing breach-of-contract claims under both the PPA and the LPA.

Turning to the alleged breaches, REA argues that, after it decided not to move forward with the 22 leases, it complied with the terms of the LPA by notifying Novel of its decision and offering Novel a chance to reclaim the leases. Novel argues that REA breached the LPA by failing to notify Novel until four months *after* the leases had been irrevocably withdrawn from the IA queue. Under the LPA, "[i]n the event that [REA] . . . elects to not develop a project in connection with a Lease and notifies [Novel] of its election to not proceed, . . . [Novel] may elect to reclaim such Lease and have it returned to [Novel]." LPA § 10. Notably, though, the LPA is silent as to *when* REA was to provide this "notifi[cation]." Because the LPA's language did not impose a timing requirement, Novel's breach-of-contract claim fails.

-13-

The good news for Novel is that, because REA had complete discretion over the timing of the notice, Novel has a viable claim for breach of the implied covenant of good faith and fair dealing.  "A party breaches the covenant of good faith and fair dealing if it exercises a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the agreement and denies the other party the expected benefit of the agreement."  *Rock Port Mkt, Inc. v. Affiliated Foods Midwest Coop.*, 532 S.W.3d 180, 188 (Mo. App. 2017) (citations omitted).[6]  A genuine dispute exists as to whether REA's decision to send notice only months *after* removing the leases from the IA queue denied Novel the benefit of the LPA's notice requirement.  REA's motion for summary judgment is therefore granted regarding Novel's breach-of-contract claim but denied regarding its claim for breach of the implied covenant of good faith and fair dealing.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. REA's motion for partial summary judgment [ECF No. 116] is GRANTED IN PART and DENIED IN PART as follows:

---

[6]Missouri law governs the LPA.  LPA § 11(g).

      a.      Novel's claim against REA for breach of the PPA by failing to provide financing introductions is DISMISSED WITH PREJUDICE AND ON THE MERITS.

      b.      Novel's claim against REA for breach of the LPA is DISMISSED WITH PREJUDICE AND ON THE MERITS.

      c.      The motion is DENIED in all other respects.

2.    Novel's motion for partial summary judgment [ECF No. 131][7] is DENIED.

Dated: June 2, 2025                                                 /s/ Patrick J. Schiltz
                                                                        Patrick J. Schiltz, Chief Judge
                                                                        United States District Court

---

[7]The Court previously granted Novel's motion to strike Exhibit 37 of the Bruns Declaration, ECF No. 120-2, from the bench. Hrg. Tr. 88:23–89:9.