UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

REA INVESTMENTS, LLC,                          Case No. 23-CV-1159 (PJS/JFD)

    Plaintiff/Counter Defendant,

v.                                                            ORDER

NOVEL ENERGY SOLUTIONS, LLC,

    Defendant/Counter Plaintiff.

---

Robert L. Smith, Colin M. Bruns, Christian D. Poppe, Katherine E. Seivert Erdman, Matthew T. Collins, and Katarzyna Kokoszka, FABYANSKE, WESTRA, HART & THOMPSON, P.A., for plaintiff/counter defendant.

Jennifer L. Filippazzo and Melissa R. Alvarez, MCDERMOTT WILL & SCHULTE LLP; and Ian Andrew Blodger and Roxanna Gonzalez, DORSEY & WHITNEY LLP, for defendant/counter plaintiff.[1]

This complex contract dispute involves two agreements between plaintiff/counter defendant REA Investments, LLC ("REA") and defendant/counter plaintiff Novel Energy Solutions, LLC ("Novel"):  (1) the Project Provision Agreement ("PPA") and (2) the Lease Purchase Agreement ("LPA").  After a 10-day trial, a jury concluded that Novel breached the express terms of the PPA and that REA breached the implied

---

[1]Dorsey & Whitney withdrew as counsel of record from this case after the instant motions were briefed and taken under advisement.  *See* ECF No. 418.

covenant of good faith and fair dealing in the LPA.  ECF No. 371.  But the jury awarded each side only $1.00 in nominal damages.

REA now moves for a new trial on damages under Fed. R. Civ. P. 59(a)(1) and for an award of attorney's fees and costs under Fed. R. Civ. P. 54(d).  ECF Nos. 398, 392. For the following reasons, both motions are denied.

## I.  BACKGROUND

The full history of this long and contentious litigation is well documented,[2] so the Court will describe only the facts relevant to REA's post-trial motions.

### A.  The PPA

Under the PPA, the parties agreed that Novel would provide at least 50 megawatts of solar-energy projects to REA to develop.  Novel also agreed to develop those projects on REA's behalf.  Trial Ex. P-0063; Trial Tr. at 5:14–6:14.  At trial, REA contended that Novel breached the PPA by providing only 18 megawatts of projects. *E.g.*, Trial Tr. at 1387:21–22 ("[T]he allegation here is that REA didn't receive 32 megawatts of projects . . . .").  REA alleged that, had Novel fulfilled its contractual obligation, REA would have earned millions of dollars of profits on the additional projects.  *Id.* at 1407:9–1409:6.  REA supported its claim for damages through the expert

---

[2]*See, e.g.*, ECF No. 191, *REA Invs., LLC v. Novel Energy Sols., LLC*, No. 23-CV-1159 (PJS/JFD), 2025 WL 1555478, at *1–2 (D. Minn. June 2, 2025) (summary-judgment order).

testimony of Barry Sussman, a certified public accountant, *see, e.g., id.,* and Mike Mills, REA's part owner and Chief Executive Officer, *see, e.g., id.* at 388:15–390:8, 2645:21–2646:8.

The challenge for Sussman and Mills was to establish a reasonable basis for the jury to calculate the amount of future profits that REA lost on the 32 megawatts of hypothetical projects that Novel failed to provide. Sussman estimated those lost profits by extrapolating from the profits that REA had made in the past and expected to make in the future on six of its solar projects, which he called "surrogates." *Id.* at 1388:4–1389:13; 1403:4–25; 1407:9–1409:6; 1414:9–21.

Three of the surrogates were solar projects that REA had developed and then quickly sold (the "sale projects"): Canton, Industrial Road, and Albion. *Id.* at 1388:17–1389:2, 1389:14–25. For each of the sale projects, Sussman calculated a net profit to REA by subtracting the amount that REA spent developing the project from the amount that REA received when it sold the project. *Id.* at 1389:18–25, 1394:13–1397:10. Sussman then calculated a per-megawatt profit by dividing the total profits earned on the three sale projects by the total number of megawatts provided by those projects. Finally, Sussman multiplied the per-megawatt profit by 32—the number of megawatts that Novel failed to provide REA. *Id.* at 1405:11–1406:2.

The other three surrogates were solar projects that REA had not sold but instead had kept for itself and operated at a profit (the "held projects"):  Augusta Road, Pequawket, and Route 32 China.  *Id.* at 1388:17–1389:13; 1390:14–1391:2.  For these projects, Sussman identified two sources of revenue to REA:  (1) the proceeds from the sale of tax equity on the projects and (2) REA's estimated earnings on the projects over 40 years.  *Id.* at 1400:2–1405:10; 1406:3–12.  Sussman then subtracted prior and projected future expenses from the prior and projected future revenues to estimate the total net profits, calculated the average profit per megawatt, and multiplied the average per-megawatt profit by 32.  *Id.* at 1405:3–10; 1406:3–12.

Then, based in part on financial models developed by REA, Sussman calculated the total amount of lost profits by weighting the held projects at two-thirds and the sale projects at one-third.  *Id.* at 1406:13–1407:2.  This produced a total damages figure of $74,984,998.  *Id.* at 1407:9–1409:4; 2646:22–25 (explaining in closing argument that "ultimately what [Sussman] did is he averaged out held and sold, two-thirds held, one-third sold, and he concluded that the right damages number is just under $75 million"); 2647:6–8 (recommending the jury "defer to [Sussman's] actual opinion which is, the final one, the $74,984,998").[3]

---

[3]In addition to this principal figure, REA submitted three alternate damages calculations to the jury:  (1) approximately $28,000,000, calculated based on Mills's testimony and the Canton Road project alone (Trial Tr. at 2645:21–2646:8);

(continued...)

After hearing Sussman's testimony and the other evidence, the jury received its final instructions, including the following instruction regarding nominal damages:

> If you should find from a preponderance of the evidence that REA's loss of profits was proximately caused by Novel's breach of the PPA, then the fact that it may be difficult to ascertain the precise amount of lost profits should not affect REA's recovery, particularly if Novel's wrongdoing has caused the difficulty in determining the precise amount.
>
> At the same time, REA cannot be awarded purely speculative damages. Damages for lost profits may be awarded only when there is some reasonable basis in the evidence for determining that REA has in fact suffered a loss of profits, even though the amount of such loss may be difficult to ascertain.
>
> In arriving at the amount of any loss of profits sustained by REA, you are entitled to consider any past earnings of REA, as well as any other evidence in the case bearing upon the issue.
>
> If you determine that, although REA has proven that it suffered lost profits caused by a breach of the PPA by Novel, REA has not provided a reasonable basis for calculating the amount of those lost profits, you should award nominal damages in the amount of $1.00 to REA.

ECF No. 367 at 14–15, Instruction No. 21. The jury found that Novel breached the PPA and awarded REA $1.00 in nominal damages. ECF Nos. 371, 375.

---

[3](...continued)
(2) approximately $41,000,000, calculated based on the three sale projects alone (*id.* at 2646:9–15); and (3) approximately $91,000,000, calculated based on the three held projects alone (*id.* at 2646:16–22).

Novel also brought counterclaims against REA, alleging that REA had breached the PPA.  At the case's inception, Novel asserted counterclaims based on REA's failure to provide Novel with financing introductions, M&A opportunities, tax-equity commitments, and life-insurance-debt placements.  ECF No. 17 at 9–10, ¶¶ 19–24.  The Court granted REA summary judgment on the claim regarding the lack of financing introductions.  ECF No. 191 at 12.  At trial, Novel's expert testified that Novel suffered approximately $95 million dollars in damages (including lost profits) due to REA's failure to provide life-insurance-debt placements and tax-equity financing to Novel.  Trial Tr. at 2406:10–19.  After Novel rested, the Court dismissed the M&A and life-insurance-debt claims, leaving only the tax-equity claim for the jury to consider.  *See id.* at 2543:8–10.  As to that claim, the Court ruled that Novel could not prove actual damages as a matter of law—meaning that, if the jury found that REA breached the PPA by failing to provide tax-equity commitments, the jury could award only nominal damages.  *See id.* at 2543:8–25 (granting REA's motion for judgment as a matter of law on the PPA counterclaims "save for [the] nominal damages issue").  The jury found that REA did not breach the PPA.  ECF Nos. 371, 375.

*B. The LPA*

In the LPA, the parties agreed that Novel would secure leases for land on which to construct and operate solar-energy projects, that REA would purchase those leases from Novel, and that, if REA decided not to go forward with developing a lease that it had purchased, REA would give Novel an opportunity to reacquire that lease.  Trial Tr. at 6:22–24.  Novel alleged that REA breached the express terms of the LPA and the implied covenant of good faith and fair dealing in the LPA because, with respect to 22 leases that REA decided not to develop, REA withdrew those leases from the Xcel Energy queue (thereby rendering them less valuable) before giving Novel an opportunity to reacquire them.  *Id*. at 8:1–3, 106:18–107:21.  The Court granted summary judgment to REA on the breach-of-contract claim but permitted the implied-covenant claim to proceed to trial.  ECF No. 191 at 13–14.

At trial, Novel withdrew its claim that it had suffered $65 million in damages as a result of REA's breach of the implied covenant and alleged instead that it had been damaged in the amount of $9.2 million.  Trial Tr. at 1231:1–1232:1.  After Novel rested, the Court ruled that a reasonable jury could not find that Novel suffered actual damages as a result of REA's alleged breach of the LPA.[4]  *Id.* at 2532:2–6 (foreclosing

---

[4]The LPA is governed by Missouri law.  Trial Ex. D-0576 at 8 ¶ 11(g).  In Missouri, a plaintiff can prevail on a breach-of-contract or implied-covenant claim and recover nominal damages even if the plaintiff fails to prove actual damages.  *Shirley's*

(continued...)

any damages under the LPA implied-covenant claim "save for . . . nominal damages").

Accordingly, the Court instructed the jury as follows:

> You are not being asked to determine damages with respect to Novel's claims against REA, even if you find that REA breached the PPA, the LPA, or both.  You should not speculate about or concern yourselves with the reason for that fact.  You should simply follow your instructions and answer the questions that appear on the verdict form.

ECF No. 367 at 14, Instruction 20.  The jury found that REA had breached the implied covenant, and, as instructed, awarded Novel $1.00 in nominal damages.  ECF Nos. 371, 375.

### C.  Post-Trial Motions

REA now moves for a new trial on damages and for an award of attorney's fees and costs.  ECF Nos. 393, 399.  Both the PPA and the LPA include fee-shifting provisions.  The PPA's clause provides as follows:

> If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties will be entitled to recover

---

[4](...continued)
*Realty, Inc. v. Hunt*, 160 S.W.3d 804, 808 (Mo. Ct. App. 2005) ("Nominal damages are available upon proof of the contract and its breach, regardless of whether actual damages have been proven." (citation omitted)); *see also Amoroso v. Truman State Univ.*, 683 S.W.3d 298, 304 (Mo. Ct. App. 2024) ("[T]he measure of damages in a claim for breach of the implied covenant of good faith and fair dealing is the [same as the] contract measure of damages." (citation omitted)).

> reasonable attorney's fees and all other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled.

Trial Ex. P-0063 at 5 ¶ 6(e).

The LPA's fee-shifting clause states that, "[i]n the event of a dispute arising under the terms of this Agreement, the prevailing party in any litigation shall be reimbursed all reasonable attorney's expenses made pursuant to said dispute." Trial Ex. D-0576 at 8 ¶ 11(g). REA—which, again, recovered a total of $1.00—now moves for awards of $1,530,209.45 in attorney's fees and $359,588.01 in non-taxable costs. ECF No. 395, Smith Decl. ¶¶ 13, 25–26. REA also moves for $55,990.16 in taxable costs. ECF No. 391, Bill of Costs.

## II.  ANALYSIS

### A.  New Trial

#### 1.  Legal Standard

Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure permits a party to move for a new trial on some or all issues decided by a jury, including damages. *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 809 (8th Cir. 2017). Federal law supplies the standard for whether to grant a new trial, but when a federal court sits in diversity, state law supplies the substantive law regarding the adequacy of a damages award. *See Niemiec v. Union Pac. R.R. Co.*, 449 F.3d 854, 858–59 (8th Cir. 2006).

Illinois law governs the PPA and therefore governs the issue of whether REA is entitled to a new trial. Trial Ex. P-0063 at 5 ¶ 6(a); *McClain v. Owens-Corning Fiberglass Corp.*, 139 F.3d 1124, 1126 (7th Cir. 1998) ("Because [a party's] liability is based on Illinois law, Illinois law governs the question of whether the evidence supports the award of damages." (citation omitted)). A new trial is warranted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Est. of Burford v. Acct. Prac. Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017).

## 2. Damages

As noted, REA seeks a new trial on the amount of lost-profits damages it suffered as a result of Novel's failure to provide 32 megawatts of solar-energy projects. In a very recent and somewhat similar case involving a jury award of nominal damages, the Seventh Circuit held that a district court "correctly instructed the jury about Illinois law" when the district court told the jury that the plaintiff had "'the burden to establish a reasonable basis for computation of damages,' that damages 'may not be awarded on the basis of conjecture or speculation,' and that if [a plaintiff] 'fails to provide a proper basis for computing its damages, only nominal damages (i.e., $1.00) can be recovered.'" *Boldt Co. v. Black & Veatch Constr., Inc.*, 181 F.4th 707, 716 (7th Cir. 2026); *see also Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 66 (Ill. 1987) (holding that, if a party

-10-

establishes that it suffered harm but does not provide "a reasonable basis for the computation of damages," that party is entitled to only nominal damages) (citations omitted)).

Nothing about the jury's decision to award nominal damages to REA in this case "cries out to be overturned or shocks [the] conscience." *Est. of Burford*, 851 F.3d at 646. To the contrary, both the record of this case and the Court's own observations at trial make clear that "the jury followed the court's instructions, concluded that it had no reasonable basis to compute damages, and properly awarded only a nominal recovery." *Boldt Co.*, 181 F.4th at 715.

"[U]nder Illinois law, the adequacy of the basis for calculating damages is a question for the finder of fact." *Id.* at 716 (citation omitted). In this case, REA's argument regarding the amount of profits it would have earned on the 32 megawatts of projects Novel failed to supply was supported almost exclusively by the testimony of Sussman and Mills. Hence, "[i]f the jury found that one or both witnesses lacked credibility, then [the jury] would be left with no other non-speculative means of calculating [REA's] damages." *Boldt Co. v. Black & Veatch Constr., Inc.*, No. 19-CV-8383, 2025 WL 1384292, at *4 (N.D. Ill. May 12, 2025), *rev'd in part on other grounds*, 181 F.4th 707 (7th Cir. 2026). Of course, credibility determinations are for the jury to make.

-11-

The jury had ample reason to discredit Sussman's testimony—which, as described above, was based on extrapolating from profits that REA had earned or projected it would earn from six "surrogate" projects. First, Sussman looked at only six surrogates, even though REA had developed dozens (if not hundreds) of solar projects over the years. Second, all of the surrogates were in Maine, even though Novel mostly did business in Minnesota. Third, Novel had not been involved in any of the surrogates. Trial Tr. at 1388:4–16 (describing the chosen Maine projects as "surrogates"), 1415:9–24 (confirming that the surrogates were not developed by Novel); *see also* Trial Ex. P-0188 (contemplating future PPA projects to be sited in Maine). And finally, Sussman permitted *Mills*—who obviously had a huge financial stake in the outcome of the trial—to select *Sussman's* six surrogates. In calculating the profits that REA made or would have made on those projects, Sussman also relied entirely on models provided by *Mills*. Sussman appears to have done nothing to verify that the six surrogates were fairly representative of the projects that Novel would have provided, nor to verify that the models were reliable. In short, Sussman's "expert" testimony appeared to involve little more than channeling whatever Mills told him. Sussman's testimony on cross-examination speaks for itself:

> Q.    Okay. But you had no role in determining the weighting given to the six projects, did you?

A.    Well, I did have a role in that I had the discussion with Mr. Mills. We talked about the issue, and *he explained his rationale and so I adopted that*. So I did have a role in the fact that it became part of my opinion, yes.

Q.    Okay. But you adopted Mr. Mills' rationale; correct?

A.    I relied on him for understanding the operations of his organization, yes.

Trial Tr. at 1433:25–1434:8 (emphasis added).

Q.    Did you consider whether any of the rates that were built into the price of the projects that REA obtained from a different developer were the same as the rates that REA and Novel had previously agreed upon?

A.    I did not. *I relied on Mr. Mills that these were comparable projects*.

*Id.* at 1437:8–13 (emphasis added).

Q.    You didn't do anything to vet those assumptions, did you?

A.    No, but I just knew that these were models that they utilized in their tax equity transactions and they used in their sales transactions. So they've been reviewed by organizations that are third parties. They've also—their projections have been reviewed and used by organizations like Novel as well.

Q.    Okay. But you just adopted those assumptions and put them into this chart; correct?

A.    Yes.

*Id.* at 1440:14–24.

Q.    Okay. Just to kind of tie everything together. The projects that you have—that you have based your opinion on are—include different

-13-

> revenue assumptions than the projects that Novel developed for
> REA; correct?
>
> A.      I don't know.  I know I used projects from Mr. Mills *that he*
>         *represented to me were comparable projects.*

*Id.* at 1459:3–8 (emphasis added).

REA contends that Sussman's calculations regarding the six surrogate projects were nevertheless reliable because (1) many of REA and Novel's future projects were intended to be in Maine (even though that was not a requirement of the PPA), (2) Novel did not present rebuttal expert evidence, and (3) Novel did not establish at trial that the sample size was too small or flawed to be credible.  *See* ECF No. 400 at 2–4.  But these are arguments that REA made to the jury—and that Novel disputed—and ultimately it was up to the jury to decide what weight, if any, to give them.

The jury also had the responsibility of determining what weight, if any, to give to the testimony of Mills, who was REA's principal owner and executive, and therefore was not a disinterested witness.  Mills testified about the Canton project—one of the three "sale projects" that Mills selected for Sussman—that sold for $14,294,603 and netted REA about $4 million in profits.  Trial Ex. P-0638; Trial Tr. at 388:15–390:25.  According to Mills, the Canton project was a "typical" REA transaction.  Trial Tr. at 389:22–390:8.  In its closing argument, REA suggested that even without "a person like Mr. Sussman," REA's experience with the Canton project would allow the jury to calculate its lost

-14-

profits on the 32 megawatts of projects that Novel failed to provide. *Id.* at

2645:21–2646:8.[5]

Obviously, though, the jury was not required to accept Mills's assertion that the

Canton project was "typical."  The jury had ample reason to be skeptical of Mills's

testimony, given that he had a huge financial stake in the outcome of the trial.

Moreover, REA did not present any evidence supporting Mills's claim that the Canton

project was "typical"; indeed, the Canton-based calculation was not even mentioned in

front of the jury until REA's attorney gave his closing argument.

For these reasons, a reasonable jury could have discredited the testimony of

Sussman, Mills, or both, leaving it "no reasonable basis to compute damages." *Boldt Co.*,

181 F.4th at 715.  REA's motion for a new trial on damages is therefore denied.

### B.  Attorney's Fees

In addition to moving for a new trial on damages, REA seeks to force Novel to

reimburse it for the $1,530,209.45 in attorney's fees that REA incurred in collecting $1.00.

Smith Decl. ¶ 13.  (REA also seeks to recover over $400,000 in costs.)  As explained

---

[5]Specifically, REA encouraged the jury to take the $4 million in profit that REA had earned on the Canton project and divide it by 4.563 (the size of the Canton project in megawatts).  That would result in a profit-per-megawatt of $876,000. *See id.*  REA then encouraged the jury to multiply that figure by 32 to calculate the total amount of profits that REA would have earned on the 32 megawatts of projects that Novel failed to provide.  Had the jury agreed with REA, it would have awarded approximately $28,000,000 in lost-profits damages. *Id.*

above, both the PPA and the LPA provide that a "prevailing party" is entitled to recover its attorney's fees.[6]  Trial Exs. P-0063 at 5 ¶ 6(e), D-0576 at 8 ¶ 11(g).  The question, then, is whether REA is a "prevailing party."

### 1.  Standard of Review

REA's entitlement to attorney's fees turns on Illinois and Missouri law.

Illinois law governs the PPA.  Trial Ex. P-0063 at 5 ¶ 6(a).  Under Illinois law, "contractual provisions for attorney fees must be strictly construed and the court must determine the intention of the parties with respect to the payment of fees."  *Grossinger Motorcorp, Inc. v. Am. Nat'l Bank and Tr. Co.*, 607 N.E.2d 1337, 1348 (Ill. 1992) (citation omitted).  A party "prevails" if it (1) "is successful on any significant issue in the action and achieves some benefit in bringing suit[,]" (2) "receives a judgment in its favor[,]" or (3) obtains an "affirmative recovery."  *Raffel v. Medallion Kitchens of Minn., Inc.*, 139 F.3d 1142, 1147 (7th Cir. 1998) (quoting *Grossinger*, 607 N.E.2d at 1348).  Importantly, however, when (as here) a dispute between two parties "involves multiple claims and both parties have won and lost on different claims, it may be inappropriate to find that either party is the prevailing party and an award of attorney fees to either is inappropriate."  *Powers v. Rockford Stop-N-Go, Inc.*, 761 N.E.2d 237, 240 (Ill. Ct. App. 2001)

---

[6]Both Illinois and Missouri require litigants to pay their own attorney's fees unless a contract or statute provide otherwise.  *E.g.*, *Pa. Truck Lines, Inc. v. Solar Equity Corp.*, 882 F.2d 221, 227 (7th Cir. 1989) (Illinois); *Jacobson Warehouse Co., Inc. v. Schnuck Mkts., Inc.*, 13 F.4th 659, 680 (8th Cir. 2021) (Missouri).

(citations omitted); *cf. Cole v. Wodziak*, 169 F.3d 486, 488 (7th Cir. 1999) ("A paltry jury award . . . implies that the only reasonable fee is zero." (citation omitted)).

Missouri law governs the LPA.  Trial Ex. D-0576 at 8 ¶ 11(g).  Under Missouri law, "[i]f a contract provides for the payment of attorneys' fees and expenses incurred in the enforcement of a contract provision, the trial court must comply with the terms of the contract and award them to the prevailing party."  *DocMagic, Inc. v. Mortgage P'ship of Am., L.L.C.*, 729 F.3d 808, 812 (8th Cir. 2013) (applying Missouri law) (quotation omitted). But "a party may only recover its fees under a contract provision if it is a prevailing party."  *Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 528 (Mo. Ct. App. 1998) (citation omitted).  The LPA does not define "prevailing party," so the Court looks to Missouri law in determining the meaning of the term.  *DocMagic*, 729 F.3d at 812.

Under Missouri law, "[a] prevailing party is one who obtains a judgment from the court, regardless of the amount of damages."  *Id.* (quotation omitted).  To decide which party (if either) is the prevailing party in a mixed-verdict case, Missouri courts use two approaches.  The "main-issue analysis" asks whether the party seeking fees succeeded "on the main issue in the dispute," even if not to the extent hoped.  *Id.* at 813 (quotation omitted).  By contrast, the "net-prevailing-party analysis" asks which party "received the most points" and then "declares the winner."  *Id.* (cleaned up).  In light of these two

inconsistent approaches, the Eighth Circuit has said that a trial court does not err as long as the trial court acts reasonably and considers the totality of the case. *Id.* at 814.

2.  Illinois Law and the PPA

REA is not a prevailing party under Illinois Law and the PPA.  True, REA prevailed on a significant issue regarding the PPA because Novel was found to have breached—and REA not to have breached—the contract.  But REA did not achieve a benefit in bringing suit because, at the end of the day, it recovered nothing.  *See Med+Plus Neck & Back Pain Ctr., S.C. v. Noffsinger*, 726 N.E.2d 687, 719 (Ill. Ct. App. 2000) (denying attorney's fees motion when the plaintiff received a favorable judgment but "failed to prove the existence of any actual damages"); *see also Ivey v. Transunion Rental Screening Sols., Inc.*, 186 N.E.3d 1076, 1090–91 (Ill. Ct. App. 2021) (finding that a ruling that the opposing party breached its duty was not itself a benefit in bringing suit and concluding that, "given that each party won and lost on different claims, neither party is entitled to prevailing party fees" (citation omitted)).

Not only that, but REA itself was found to have breached the LPA.[7]  *See Raffel*, 139 F.3d at 1147 (directing courts to assess success on "*any* significant issue in the action" (emphasis added)); *cf. Peleton, Inc. v. McGivern's Inc.*, 873 N.E.2d 989, 995 (Ill. Ct. App. 2007) (declining to award fees when "the trial court's decision gave each side

---

[7]REA does not argue that the Court cannot consider the entire case in determining whether REA prevailed under Illinois law.

something"). Just as Novel was ordered to pay $1.00 to REA for breaching the PPA, REA was ordered to pay $1.00 to Novel for breaching the LPA. "[T]he case was essentially a draw." *See Raffel*, 139 F.3d at 1147 (affirming the district court's denial of both parties' motions for attorney's fees); *see also Med+Plus Neck & Back Pain Ctr.*, 726 N.E.2d at 719 (concluding that a party was entitled to nominal damages but not to attorney's fees "as both parties were successful on significant issues in the action").

Because the case was a draw, the Court cannot find that REA was the prevailing party. "Sometimes in litigation, neither side wins. This is one of those times." *Raffel*, 139 F.3d at 1143; *see also Peleton*, 873 N.E.2d at 992 (declining to award fees where "[n]either [party] is entirely free from fault here; neither is entirely to blame").

### 3. Missouri Law and the LPA

REA fares no better under Missouri law. Judgment was entered against REA on the LPA claim. ECF No. 375. A party that loses—in particular, a party that is found to have *breached* a contract—does not "prevail" for purposes of the *same contract's* fee-shifting provisions. *Cf. DocMagic*, 729 F.3d at 812 ("A prevailing party is one who obtains a judgment from the court, regardless of the amount of damages." (citations omitted)).

The result does not change upon analysis of the case in its entirety. Novel was found to have breached the PPA but, because REA failed to provide sufficient proof of

damages, REA was awarded only $1.00 in nominal damages.  On the same verdict form, REA was found to have breached the LPA but, because Novel failed to provide sufficient proof of damages, Novel was awarded only $1.00 in nominal damages.  REA does not cite, and the Court has not found, any case applying Missouri law in which both parties were awarded only nominal damages yet one party was deemed to have "prevailed." *Accord Evans v. Werle*, 31 S.W.3d 489, 493 (Mo. Ct. App. 2000) (affirming attorney's-fees award for plaintiff who received only nominal damages in the absence of any award to opposing party).

In the Court's view, that should be the end of the matter.  The case was a wash.  Neither side prevailed.  Still, both parties seem to assume that the Court is required to apply the main-issue and net-prevailing-party analyses with respect to the fee-shifting clause in the LPA.  *See* ECF Nos. 394 at 6–10, 403 at 6–9.  The Court will briefly do so, but, under both approaches, the result is the same:  REA is not a prevailing party.

### a.  Main-Issue Analysis

The main issue under the LPA was whether REA breached either an express term in the contract or the implied covenant of good faith and fair dealing when REA withdrew 22 leases from the Xcel Energy queue before giving REA notice of its intention and an opportunity to reacquire the leases and maintain their position in the queue.  REA contends that it is the prevailing party under the main-issue approach because it

"successfully defend[ed]" against Novel's breach-of-contract claim (which was dismissed at summary judgment) and defeated Novel's theory of damages on the implied-covenant claim. ECF No. 394 at 6–8. The jury, however, found that REA *breached* the implied covenant—i.e., that REA had breached the very contract that contains the fee-shifting provision on which REA relies. In the Court's view, this precludes REA from being deemed to have "prevailed" under the contract that it breached. *Cf. Jenkins v. Missouri*, 127 F.3d 709, 714 (8th Cir. 1997) ("It is generally true that status as a prevailing party is determined by the outcome of the case as a whole, rather than by piecemeal assessment of how a party fares on each motion along the way.").

### b. *Net-Prevailing-Party Analysis*

Under the net-prevailing-party analysis, "the party in whose favor the verdict compels a judgment is the prevailing party. Each side may score, but the one with the most points at the end of the contest is the winner . . . ." *Birdsong v. Bydalek*, 953 S.W.2d 103, 124 (Mo. Ct. App. 1997) (citing *Ozias v. Haley*, 125 S.W. 556 (Mo. 1910)).

REA claims that it won the most points on the LPA claim because it defeated Novel's breach-of-contract claim at summary judgment and then, at trial, successfully argued that Novel had failed to adequately support its damages theories. REA also points out that "the comparison between the amount originally sought by Novel and the

-21-

ultimate award is substantial."  ECF No. 394 at 9.  By REA's calculation, therefore, REA

has three points to Novel's one point (for its success in proving a breach of the implied

covenant), so REA is the net prevailing party.

This is contrary to law and reason.  Suppose that Novel had also asserted a claim

for, say, misrepresentation, sought $50 million in damages, and been awarded

$1 million.  Under REA's method of calculation, REA would still have "won"—four

points to two[8]—even though, at the end of the day, Novel recovered $1 million plus

$1.00 and REA recovered $1.00.  That doesn't seem right.

In a case such as this—a business dispute in which both parties are interested only

in recovering money—it makes little sense to decide who was the "net prevailing party"

by carving up the case into discrete issues and then counting up wins and losses.  (This

approach is also extraordinarily manipulable.)  Rather, the best way to determine who is

the net prevailing party in such a case will most often be to examine the *recoveries*.  Here,

REA sought tens of millions of dollars and recovered one dollar, and Novel sought tens

---

[8]Presumably, REA would claim that it gets four points because (1) REA defeated Novel's breach-of-contract claim at summary judgment; (2) REA successfully defended against Novel's damages theories on the implied-covenant claim at trial; (3) Novel sought vastly more in damages on its implied-covenant claim that it recovered; and (4) Novel sought vastly more in damages on its misrepresentation claim than it recovered.  (To the Court, it appears that (2) and (3) represent double counting, but no matter.)  Novel would presumably get two points because (1) Novel succeeded in proving that REA breached the implied covenant; (2) Novel succeeded in proving that REA committed the tort of misrepresentation.

of millions of dollars and recovered one dollar.  To declare one or the other to be the

"prevailing" party would stretch the term beyond recognition.

### C.  Costs

#### 1.  Non-Taxable Costs

In addition to attorney's fees, REA requests reimbursement of $359,588.01 in non-

taxable costs.  Smith Decl. ¶ 25.  The PPA and LPA provide that a prevailing party may

recover costs incurred in prosecuting or defending claims arising out of the contract.

Trial Exs. P-0063 at 5 ¶ 6(e); D-0576 at 8 ¶ 11(g).[9]  As the Court has found, however, REA

did not prevail under either agreement.

#### 2.  Taxable Costs

REA also seeks approximately $56,000 in taxable costs per Fed. R. Civ. P. 54 and

D. Minn. L.R. 54.3(c).  *See* ECF No. 391.  Rule 54 provides that costs "should be allowed

to the prevailing party."  But when "neither party prevails on its claim, it is quite

appropriate to deny costs . . . ."  *Kropp v. Ziebarth*, 601 F.2d 1348, 1358 n.27 (8th Cir. 1979)

(citation omitted).  That is what the Court chooses to do here:  deny costs.

At bottom, this case is about a business relationship that soured.  Each party

breached contractual obligations that it owed to the other, but neither party suffered

much in the way of damages.  The parties should have just walked away from their deal

---

[9]Technically, the LPA refers only to "attorney's expenses."  Trial Ex. D-0576 at 8 ¶ 11(g).

and ceased doing business with each other.  That was the message sent by the jury, and

that is the message now sent by the Court.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT

IS HEREBY ORDERED THAT:

1.    Plaintiff/counter defendant's motion for attorney fees and costs [ECF No.

392] is DENIED.

2.    Plaintiff/counter defendant's motion for a new trial on damages [ECF No.

398] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 6, 2026                    /s/ Patrick J. Schiltz
                                         Patrick J. Schiltz
                                         United States District Judge

-24-